## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SENATOR GENE YAW, SENATOR LISA BAKER, and THE PENNSYLVANIA SENATE REPUBLICAN CAUCUS, in their official legislative capacities and as trustees of the natural resources of the Commonwealth of Pennsylvania, DAMASCUS TOWNSHIP, DYBERRY TOWNSHIP, CARBON COUNTY, and WAYNE COUNTY, in their official capacities and as trustees of the natural resources of the Commonwealth of Pennsylvania,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE DELAWARE RIVER BASIN COMMISSION,<br><br>*Defendant*. | No. :21-cv-00119-PD |

## <u>FIRST AMENDED COMPLAINT</u>

Senators Gene Yaw, Lisa Baker, and the Pennsylvania Senate Republican Caucus (the "Senate Plaintiffs"), in their official legislative capacities and their concomitant capacities as trustees of the natural resources of the Commonwealth of Pennsylvania, together with the Township of Damascus, Township of Dyberry, Carbon County, and Wayne County (the "Municipal Plaintiffs"), in their official

capacities as trustee of the Commonwealth's natural resources, submit this Complaint for Declaratory Relief and aver as follows:

## PRELIMINARY STATEMENT

1.     This is a declaratory action pursuant to the Federal Declaratory Judgment Act, *see* 28 U.S.C. § 2201, concerning the scope of power granted to Defendant Delaware River Basin Commission (the "Commission") pursuant to an interstate compact.

2.     Specifically, Plaintiffs seek a declaration that the Commission's prohibition of the construction and operation of wells natural gas extraction violates the terms of the Delaware River Basin Compact (the "Compact"), *see* Exhibit A, which is the exclusive source of the Commission's authority.

3.     Alternatively, to the extent the prohibition is found to be valid exercise of authority conferred on the Commission by the Compact, Plaintiffs seek a declaration that the prohibition constitutes a regulatory taking without just compensation under the Fifth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

4.     This action arises under an interstate compact and, hence, raises a federal question over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5.     Further, this Court has supplemental jurisdiction over the state law claims, as they are so related to federal questions that they form part of the same case or controversy.

6.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b).

## PARTIES

### *The Senate Plaintiffs*

7.     Senators Gene Yaw and Lisa Baker are members of the Senate of Pennsylvania, which is one of the two chambers in the General Assembly vested with the exclusive legislative power of the Commonwealth of Pennsylvania.

8.     Senator Yaw is a duly elected member of the Pennsylvania Senate from the 23rd Senatorial District and serves as the Chairman of the Senate Environmental Resources and Energy Committee, which, under the Rules of the Senate, is a standing committee responsible for overseeing matters related to the Commonwealth's natural resources.

9.     Senator Baker is an elected member of the Pennsylvania Senate who represents the 20th Senatorial District, spanning approximately 2,581 square miles; approximately half of Senator Baker's legislative district is situated within the geographic region over which the Commission claims jurisdiction.

10. The Pennsylvania Senate Republican Caucus is a subsidiary body of the Senate created pursuant to the chamber's constitutional authority and is tasked with performing essential legislative functions, as well as administrative business on behalf of the Senate.

11. The Caucus consists of twenty-eight members and, thus, represents the majority of the chamber's membership.

### The Municipal Plaintiffs

12. Damascus Township is a political subdivision of the Commonwealth located in Wayne County and governed by the Second Class Township Code, *see* 53 P.S. §§ 65101, *et seq*.

13. Dyberry Township is a political subdivision of the Commonwealth located in Wayne County and governed by the Second Class Township Code, *see* 53 P.S. §§ 65101, et seq.

14. Carbon County is a political subdivision of the Commonwealth governed by the County Code, *see* 16 P.S. §§ 101*, et seq.*

15. Wayne County is a political subdivision of the Commonwealth governed by the County Code, *see* 16 P.S. §§ 101*, et seq.*

### The Commission

16. The Commission is an interstate agency created by the Compact for the purpose of carrying out the agreement.

4

17.     The Commission draws its authority solely from the Compact and only has such powers as were expressly ceded to it by the participating states.

## BACKGROUND

### *The Legislative Power of the Commonwealth*

18.     Under the Pennsylvania State Constitution, the Commonwealth's primary lawmaking power is vested in the General Assembly, consisting of the Senate and the House of Representatives.  *See* Pa. Const. art. II, § 1.

19.     The legislative power—which, under the Pennsylvania State Constitution, is the power to make, alter, and repeal laws—may neither be delegated nor transferred to any other governmental unit, body, or authority.

20.     Nevertheless, the General Assembly may assign the authority and discretion to execute or administer laws, provided, however, that the delegation is accompanied by adequate standards to guide and restrain the exercise of those powers.

21.     Furthermore, several provisions of Article I of the State Constitution limit the exercise of legislative authority, including, as relevant herein:

> a. Section Ten, which provides that "private property [shall not] be taken or applied to public use, without authority of law and without just compensation being first made or secured."  Pa. Const. art. I, § 10;

b. Section Twelve, providing that "[n]o power of suspending laws [may] be exercised unless by the Legislature or by its authority[;]" Pa. Const. art. I, § 12; and

c. Section Seventeen, which prohibits the General Assembly from enacting any law "making irrevocable any grant of special privileges or immunities[.]" Pa. Const. art. I, § 17.

22.     The rights enumerated in Article I are enshrined "[t]o guard against transgressions of the high powers which [the people of the Commonwealth] have delegated" and, thus, are "excepted out of the general powers of government and shall forever remain inviolate." Pa. Const., art. I, § 25.

23.     The Senate consists of fifty Senators elected from equally apportioned districts, who, upon taking the oath of office, are organized into two separate caucuses—majority and minority—according to the two principal political party affiliations (i.e., Republican and Democratic).

24.     As such, the Pennsylvania Senate Republican Caucus is one of two integral constituent subparts of the Senate that has existed as part of the chamber's formal organizational structure since 1857.

25.     At the beginning of each legislative session, the Senate adopts certain rules for conducting the chamber's legislative and administrative business.

26.     Among other things, the extant rules vest all standing committees, including the Senate Environmental Resources and Energy Committee, chaired by Senator Yaw, with certain specific powers relative to the subject matter within their purview.

### *Plaintiff's trustee obligations under the Environmental Rights Amendment*

27.     Pursuant to the Environmental Rights Amendment to the Pennsylvania Constitution (the "ERA"), *see* Pa. Const. art. I, § 27, the public natural resources of the Commonwealth are held in trust for the benefit of the people (the "Trust").

28.     The corpus of the Trust consists of the natural resources and all funds derived from their sale or lease.

29.     As trustees, both the Senate Plaintiffs *and* Municipal Plaintiffs—like all political subdivisions in the Commonwealth—cannot allow the Trust's corpus to be managed in a manner inconsistent with the ERA.

30.     In order to prevent diminution of the Trust's corpus, the Senate Plaintiffs and Municipal Plaintiffs may bring and defend actions that impact the Trust, and take reasonable steps to increase the value of the Trust's assets.

31.     The General Assembly's constitutionally enshrined trustee obligations—like its legislative powers—may not be delegated or relinquished.

*The Compact*

32.     In 1961, the Commonwealth of Pennsylvania and the States of Delaware, New Jersey, and New York (the "Member States"), upon the enactment of concurrent legislation by their respective legislatures and approval of the United States Congress, executed the Compact.

33.     The execution of the Compact was the culmination of a decades-long effort by the Member States to develop a cohesive approach for regulating water use within the Basin.

34.     In Pennsylvania, that effort commenced in 1923, when the General Assembly authorized and directed the Governor to designate three commissioners to negotiate such an agreement, *see* Act of May 24, 1923, P.L. 448, No. 239, *codified at* 46 P.S. § 251, ultimately resulting in the formation of the now-defunct Interstate Commission on the Delaware River Basin.

35.     Following further negotiations and examination of the relevant issues, including extensive and public hearings before the Senate Committee on Forests and Waters, Game and Fish—which was the predecessor to the standing committee chaired by Senator Yaw—the Compact was ratified by the Commonwealth of Pennsylvania upon the enactment and codification of Senate Bill 350. *See generally* S.B. 350, 145th Leg., Reg. Sess. (1961), *codified at* 32 P.S. § 815.101 (adopting the Compact by the General Assembly).

36.     By its terms, the Compact is based on the mutual factual findings and

judgment of the respective "legislative bodies" of the Member States, including

that of the General Assembly.  *See* Compact, § 1.3 ("The ***legislative bodies*** of the

respective signatory parties hereby find and declare[.]" (emphasis added)).

37.     The overarching purpose of the Compact is to facilitate unified

approach for managing the water resources within the Delaware River Basin (the

"Basin"), which encompasses approximate 13,539 square miles of land within the

Member States.

38.     As summarized in Section 1.3(e):

> [i]n general, the purposes of this compact are to promote interstate
> comity; to remove causes of present and future controversy; to make
> secure and protect present developments within the state; to encourage
> and provide for the planning, conservation, utilization, development,
> management and control of the water resources of the basin; to
> provide for cooperative planning and action by the signatory parties
> with respect to such water resources; and to apply the principle of
> equal and uniform treatment to all water users who are similarly
> situated and to all users of related facilities, without regard to
> established political boundaries.

Compact, § 1.3(e).

39.     Consistent with the planning responsibilities outlined above, the

Commission may review "projects" having "a substantial effect on the water

resources of the [B]asin[.]"  Compact, § 3.8.

40.     In turn, the two material terms—"project" and "water resources"—are

defined as follows:

> '**Project'** shall mean any work, service or activity which is separately
> planned, financed, or identified by the commission, or any separate
> facility undertaken or to be undertaken within a specified area, for the
> conservation, utilization, control, development or management of
> water resources which can be established and utilized independently
> or as an addition to an existing facility, and can be considered as a
> separate entity for purposes of evaluation.

Compact, § 1.2(g).

> '**Water resources**' shall include water and related natural resources
> in, on, under, or above the ground, including related uses of land,
> which are subject to beneficial use, ownership or control.

Compact, §1.2(i).

41.     Furthermore, Section 14.14, titled "Condemnation Proceedings,"
authorizes the Commission "to acquire by condemnation the fee or any lesser
interest in lands, lands lying under water, development rights in land, riparian
rights, water rights, waters and other real or personal property within the basin for
any project or facility authorized pursuant to this compact."  Compact, § 14.14(a).

42.     Notably, however, Section 14.14(a) expressly precludes the
Commission from condemning any "property of a signatory party."  *Id.*

43.     In addition, the power to condemn may only be exercised in
accordance with "the provisions of an applicable Federal law," or, in its absence,
"such general state condemnation law as may be in force in the signatory state in
which the property is located."  Compact, § 14.14(b).

{02051952;v3 }                                    10

44.     Over 5.5 million Pennsylvanians reside within the Basin and more than half of the Basin (approximately 6,422 square miles) is located within the territorial boundaries of the Commonwealth of Pennsylvania.

45.     Municipal Plaintiffs are one of several dozen Commonwealth political subdivisions subsumed by the Basin.

46.     Each Municipal Plaintiff owns parcels of land within the Basin.

47.     In addition, the Commonwealth owns substantial land within the Basin, including twenty-three state parks and several state forests.

### *The Marcellus Shale Formation and the Basin*

48.     The Marcellus Shale Formation (the "Formation") is a geological configuration housing significant natural gas reserves.

49.     A vast swath of the Commonwealth, including approximately 2,338 square miles encompassed by the Basin, overlaps with the Formation.

50.     According to the United States Geological Survey, a federal agency that functions under the United States Department of Interior, the Pennsylvania territory located within the Basin that overlaps with the Formation alone holds an estimated $40 billion in natural gas reserves.

51.     After technological advancements in high-volume hydraulic fracturing led to development of a commercially viable method for extracting natural gas from the Formation, the Pennsylvania General Assembly enacted a detailed

regulatory scheme (1) overseeing the installation and operation of such gas wells (hereinafter referred to as "Unconventional Wells"), and (2) providing for payment of various fees for their construction and/or operation. *See* Act No. 13 of Feb. 14, 2012, P.L. 87 ("Act 13"), 58 Pa.C.S. §§ 2301-2318; 3201-327.

52.     Among other things, under Act 13's rubric, all fees for the development of Unconventional Wells are deposited in the Unconventional Gas Well Fund (the "Well Fund").

53.     In addition to his general oversight responsibilities relative to all matters pertaining to the Commonwealth's natural resources, as chairman of the Senate Environmental Resources and Energy Committee, Senator Yaw has a specific statutory duty and right to receive a detailed annual report of the Well Fund's expenditures.  *See* 58 Pa.C.S. § 2314(h).

54.     The Well Fund is administered by the Treasury Department and its proceeds are distributed annually in accordance with statutory directives.

55.     Under the statutorily prescribed funding formula, more than half of the Well Fund's annual revenue is distributed to the various municipalities where Unconventional Wells are located, for certain uses expressly enumerated in Act 13. *See* 58 Pa.C.S. § 2314(g).

56.     The Well Fund's remaining revenue is allocated for conservation-related uses and other purposes generally consistent with the Commonwealth's trustee obligations.

57.     Since 2012, the Well Fund has generated approximately $1.7 billion for State and municipal governments.

58.     In 2019, for instance, over $200 million was distributed from the Well Fund, with municipalities receiving over $109 million.

59.     As a notable example and useful reference for comparison, during that same year, over $ 5.7 million was disbursed to municipalities in Susquehanna County, which abuts Wayne County to the east, but is located outside the Basin.

60.     Although Municipal Plaintiffs' low population density and terrain renders them particularly well-suited for natural gas exploration and extraction, the Commission's moratorium and now prohibition, as set forth below, *see* ¶¶ 78-97 *infra*, has precluded Wayne County and Damascus Township, as well as other municipalities within the Basin, from participating in the Marcellus-related economic development made available to neighboring areas.

61.     Of the remaining funds in the Well Fund in 2019, over $72 million was transferred to the Marcellus Legacy Fund—a statutory fund that may be used for purposes pertinent to the environment, *see* 58 Pa.C.S. § 2315(a.1), $6 million was appropriated to the Pennsylvania Department of Environmental Protection, *see*

58 Pa.C.S. § 2314 (c.1)(3), and $1 million was appropriated to the Fish and Boat Commission, *see id.* at § 2314(c.1)(1).

62.     As such, the growth of the Well Fund has directly and materially benefited the Trust by increasing the size of its corpus and advancing its purpose.

63.     In addition to the revenue generated for State and municipal governments, between 2010 and 2018, natural gas producers have paid approximately $10 billion in royalties directly to Pennsylvania landowners.

64.     Indeed, between 2006 and 2017, a single natural gas producer (Cabot Oil and Gas) had paid over $1 billion in royalties to landowners in Susquehanna County.

65.     Notably, prior to the Commission's moratorium, countless landowners within the Basin had negotiated and/or executed leases with natural gas producers for the construction of Unconventional Wells, but as a result of the Commission's moratorium, they have been unable to derive any revenue from such agreements.

66.     For instance, a group of landowners in Wayne County expended approximately $750,000 in legal fees to negotiate a lease that was estimated to yield over $187 million during its term, but as result of the Commission's moratorium, the contract became ineffectual and, thus, was terminated.

67.     By preventing the construction of Unconventional Wells within the Basin, the Commission is not only interfering with the reasonable investment-

backed expectations of the landowners, but also directly and substantially impairing the growth of the Trust's assets.

68.     The General Assembly has also enacted legislation enabling the Commonwealth to execute leases for the mining or removal of Marcellus shale gas from state-owned land, provided that it is in the best interest of the Commonwealth.  *See*, *e.g.* 71 P.S. §§ 1340.302(a)(6) & 1340.303(a)(9).

69.     Indeed, the Commonwealth has leased State lands for natural gas extraction since 1947.

70.     Under the ERA, all natural gas reserves located in parcels owned by the Commonwealth or any of its political subdivisions, including funds derived from their sale or lease, are part of the Trust's corpus.

71.     Thus, the natural gas reserves of the twenty-three state parks and numerous state forests within the Basin are part of the Trust's corpus.

72.     Similarly the natural gas reserves within parcels owned by Municipal Plaintiffs are part of the Trust's corpus.

73.     Notably, Senator Baker's expansive legislative district includes several state parks and forests located within the Basin.

74.     All monies collected from such leases are deposited in the Oil and Gas Lease Fund (the "Lease Fund"), which, in turn, is transferred to the Environmental Stewardship Fund, the Hazardous Sites Cleanup Fund, or appropriated for other

uses comporting with the Commonwealth's obligations as trustee of its natural resources under the ERA. *See* 72 P.S. § 1601.2-E.

75.     The comprehensive statutory scheme outlined in Paragraphs 48-56 *supra*, was enacted in a valid exercise of the General Assembly's legislative authority and in furtherance of its trustee obligations.

76.     Under the ERA, the Lease Fund and the Marcellus Legacy Fund are part of the Trust's corpus and, thus, the Senate Plaintiffs and Municipal Plaintiffs have a fiduciary duty to prevent their diminution.

77.     Furthermore, the General Assembly has substantial discretion in determining the specific allocation of the money in the above-referenced funds— *i.e.*, the Well Fund, the Marcellus Legacy Fund, the Lease Fund, the Environmental Stewardship Fund, and the Hazardous Sites Cleanup Fund—albeit subject to certain restrictions stemming from its trustee duties.

***The Commission's de facto moratorium on natural gas extraction.***

78.     Notwithstanding the foregoing legislative enactments, since 2010, the Commission has categorically prohibited natural gas extraction within the Basin.

79.     The Commission has maintained that its blanket ban on the construction or operation of natural gas wells within the Basin, which it has described as a *de facto* moratorium, is a valid exercise of its power under Section 3.8 of Compact to regulate "projects" utilizing "water resources."

80.     The moratorium was first instituted by way of a notice letter and enforced by *fiat* from 2010 until February 25, 2021.

***The Commission's regulatory prohibition on natural gas extraction.***

81.     On February 25, 2021, the Commission voted to adopt proposed regulations memorializing the ban set forth in the moratorium.  *See* Exhibit B (to be codified at 18 C.F.R. §§ 440.1, *et seq.*).

82.     The newly adopted regulations contain a blanket prohibition on high volume hydraulic fracturing within the Basin. *See id.* at § 440.3.

83.     The newly adopted regulations also amend the existing regulations governing the classification of projects for review under Section 3.8 of the compact and include a new provision providing that, regardless of whether a project is expressly excluded from review, "any project or class of projects that in the view of the Commission could have a substantial effect on the water resources of the basin may . . . be subject to the requirement for review under Section 3.8 of the Compact." *See id.* at § 401.35.

84.     As a practical matter, the Commission's prohibition suspends law within the Commonwealth—a power reposed exclusively in the General Assembly under Article I, Section 12 of the Pennsylvania Constitution.

85.     More specifically, the Commission has displaced and/or suspended the Commonwealth's comprehensive statutory scheme within the Basin and

attempted to exercise legislative authority exclusively vested in the General Assembly.

86.     If valid, the Commission's interpretation of the Compact to support the adoption of these regulations wholly nullifies any present or future legislative action purporting to adopt any laws inconsistent with the prohibition and, thus, constitutes a grant of an irrevocable privilege in violation of Article I, Section 17 of the Pennsylvania Constitution.

87.     Furthermore, because it is difficult to conceive of any activity that does not require the use of water, the Commission's interpretation of Section 3.8 of the Compact, as set forth in the new regulations, potentially subsumes every undertaking within the Basin.

88.     The Commissions construct, therefore, deprives over five million citizens of the Commonwealth residing within the Basin of the right to be governed by laws enacted by their duly-elected representatives and, concomitantly, subjects them to the dictates of the unelected Commission on a potentially unlimited number of matters.

89.     In this regard, it bears noting that Compact may be modified or repealed *only* by concurrent legislation by each of the Member States and, thus, the political remedies ordinarily available for curbing administrative or executive overreach are illusory—if not wholly unavailable.

90.     In consequence, the Commission's present exercise of authority significantly dilutes the right of citizens in the Commonwealth of Pennsylvania to choose their own officers for governmental administration.

91.     The Commission's prohibition interferes with the ability of the Senate Plaintiffs and Municipal Plaintiffs to manage and act in the Trust's best interests and precludes them from exercising their constitutionally imposed fiduciary duties relative thereto.

92.     Furthermore, because the original moratorium, which has now been firmly entrenched by the newly adopted regulations are the overriding obstacle to the development of Unconventional Wells within the Basin, the Commission's actions in this regard have directly and significantly reduced the amount of revenue derived from impact fees and deposited in the Well Fund.

93.     As such, the Commission has not only interfered with Plaintiffs' management of the Trust, but it has also directly and substantially injured the Trust's corpus.

94.     Separate and apart from violating rudimentary precepts of the tripartite form of government, in applying the prohibition to property owned by the Commonwealth, the Commission has engaged in a regulatory taking of the Commonwealth's public natural resources and appropriated the Trust's corpus.

95.     In addition to harming the Trust, the Commission has also deprived Municipal Plaintiffs of their right to benefit from the Well Fund.

96.     While the Commission's arrogation of the Trust was improper from its inception, its deleterious effects have come into renewed focus in light of Governor Wolf's prolonged shutdown of the economy in response to COVID-19.

97.     In consequence of the resulting economic downturn, the Commonwealth and Municipal Plaintiffs are facing significant budgetary shortfalls, impairing their ability to fund governmental programs and fulfill their trustee obligations under the ERA.

**COUNT I**
(***Ultra vires*** **and violation of Section 3.8 of the Compact**)

98.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

99.     Because the Compact is treated as a contract between the Member States, all disputes relating to its terms are judicially assessed under settled principles of contract law.

100.    Applying this precept, the Compact is a binding contract between the Member States, which became operative after concurrent legislative enactments by their respective state legislatures. *See* 32 P.S. § 815.101(1.3); *accord* Compact, art. I, Sec. 1.3.

101.   In addition, the Compact expressly outlines the factual findings of the *state legislature* of each of the Member States—including the Pennsylvania General Assembly—and clearly states that its terms represent the policy judgment of the respective legislative bodies.

102.   Given that the Compact is a quintessential legislative contract, the Senate Plaintiffs stand in privity of contract in this action and are entitled to maintain such claims and advance such argument as any party to an ordinary contract.

103.   In imposing the prohibition, the Commission has exceeded the scope of authority granted under the plain language of Section 3.8 of the Compact and attempted to exercise powers that the General Assembly did not—and, indeed, could not—transfer.

104.   Furthermore, insofar as the Compact is materially ambiguous in this regard, the Commission's interpretation is untenable under the settled rules of construction because it is inconsistent with the intent of the parties and course of performance between them.

WHEREFORE, Plaintiffs respectfully seek a declaration form this Court that the Commission's prohibition within the Basin exceeds the power granted to it by the Compact.

## COUNT II
### (Regulatory Taking in Violation of the Compact's Express Terms, the United States Constitution, and the State Constitution)

105.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

106.   The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V (the "Takings Clause").

107.   The Takings Clause applies not only to a physical taking of property, but also to governmental regulations that substantially diminish the economic value of land or significantly hamper its economically beneficial use.

108.   Similarly, Article I section 10 of the Pennsylvania Constitution provides, in pertinent part that, "private property [shall not] be taken or applied to public use, without authority of law and without just compensation being first made or secured."  PA. Const. art. I § 10.

109.   The safeguards established under Article I, Section 10 of the Pennsylvania State Constitution is equal to—or greater than—the protections afforded under the Takings Clause.

110.   Because the prohibition prohibits the Commonwealth from executing leases for the extraction of natural gas from state-owned land within the Basin, it is a regulatory taking of the Trust without just compensation.

111.   As such, the adoption of the regulations establishing the prohibition relative to the Trust constitutes a condemnation of "property of a signatory state" in violation of the limited "grant of power of eminent domain" under Section 14.14 of the Compact.

112.   Moreover, separate and apart from the restrictions imposed by the plain language of the Compact, given the strong presumption in favor of preserving the constitutionality of interstate compacts and against calling into question the constitutionality of legislative actions, the Member States could not have intended to vest the Commission with the power of imposing a prohibition in violation of the Takings Clause and Article I, Section 10 of the Pennsylvania State Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order: (a) declaring that the Compact does not authorize the imposition of the prohibition, as such an interpretation would permit an unconstitutional regulatory taking under the Fifth Amendment of the United States Constitution and Article I, Section 10 of the Pennsylvania State Constitution, rendering the Compact illegal; or (b) declaring the Commission's prohibition a taking requiring provision of just compensation for the diminution of the economic value of the property seized under the Fifth Amendment of the United States Constitution and Article I, Section 10 of the Pennsylvania State Constitution.

### COUNT III
**(Illegal Exercise of the Power of Eminent Domain)**

113.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

114.   By foreclosing the only commercially viable method for natural gas extraction, the Commission has:

a.   deprived the Marcellus Shale gas of all economic use and, thus, effectively appropriated the property interest of individual landowners in those minerals; and

b.   exponentially diminished the value of property situated within the Basin-Marcellus overlapping region and interfered with the distinct investment-backed expectations of countless landowners.

115.   The Commission's prohibition, therefore, constitutes a regulatory taking of private property, which is separate and apart from its taking of property owned by the Commonwealth described in Count II.

116.   However, in effecting such a regulatory taking the Commission has exceeded the limited scope of eminent domain powers granted to it under Section 14.14 of the Compact.

117.   Furthermore, because the power of eminent domain is vested exclusively in the General Assembly and may only be exercised pursuant to an

express grant of legislative authority, by imposing the prohibition, the Commission has unlawfully attempted to exercise the Commonwealth's legislative power.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order declaring that: (a) the Commission's prohibition is an unauthorized attempt to exercise the General Assembly's power of eminent domain and exceeds the limited power of condemnation granted to it under the Compact; or (b) declaring the Commission's prohibition is a regulatory taking authorized by Section 14.14 and, thus, must be effectuated in accordance with the process set forth therein.

## COUNT IV
### (Violation of the Republican Form of Government Clause of the United States Constitution)

118.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

119.   Article IV, Section 4 of the United States Constitution guarantees a republican form of government to all States.

120.   The central feature of a republican form of government is the right of the people to choose their own officers for governmental administration and pass laws in virtue of the legislative power reposed in representative bodies.

121.   By usurping legislative and regulatory authority existing under the constitutional framework of the Commonwealth of Pennsylvania—and replacing state law with the dictates of a notice issued by an unelected official employed by

an interstate agency—the Commission has deprived 5.5 million Pennsylvanians of their ability to choose their laws and governmental structure, thereby violating the Guarantee Clause.

122.   As a result of the Commission's violation of the Guarantee Clause, the Commission has also palpably and substantially diminished the legislative powers of the Senate Plaintiffs, as well as the legislative and executive powers of Municipal Plaintiffs.

123.   In light of the strong presumption against unconstitutional legislative acts and in favor of preserving the constitutionality of interstate compacts, the Member States could not have intended to vest the Commission with the power of imposing a prohibition in violation of the Guarantee Clause.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order declaring that: (a) the Compact does not authorize the imposition of the prohibition , as such an interpretation would violate Article IV, Section 4 of the United States Constitution and render the Compact illegal; or (b) Section 3.8 of the Compact violates Article IV, Section 4 of the United States Constitution and, therefore, is invalid.

Respectfully submitted,

*/s/ Matthew H. Haverstick*
Matthew H. Haverstick. (No. 85072)
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Phone:  (215) 568-2000
Email:  mhaverstick@kleinbard.com
          jvoss@kleinbard.com
          svance@kleinbard.com
          szimmer@kleinbard.com

*Counsel for the Senate Plaintiffs*

*/s/Jeffrey S. Treat*
Jeffrey S. Treat, Esq. (No. 37069)
926 Court Street
Honesdale, PA 18431
Phone: (570) 253-1209
Email: svance@kleinbard.com

*Counsel for Plaintiffs Damascus Township, Dyberry Township, and Wayne County\**

<u>/s/Daniel S. Miscavige</u>
Daniel A. Miscavige, Esq., O.F.S.
GILLESPIE, MISCAVIGE &
FERDINAND LLC
3 East Butler Drive  Suite 102
Drums, Pa 18222
Phone: (570) 235-2770 (direct)
Email: dam@gmlawoffices.com

*Counsel for Plaintiff Carbon County\**

*\*Application for pro hac vice admission forthcoming*

Dated: March 31, 2021