**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SENATOR GENE YAW, *et al.*, | : No. 2:21-cv-00119-PD |
| *Plaintiffs*, | : |
| v. | : |
|  | : |
| THE DELAWARE RIVER BASIN | : |
| COMMISSION, *et al.* | : |
| *Defendants*. | : |
|  | : |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs, Senator Gene Yaw, Senator Lisa

Baker, the Pennsylvania Senate Republican Caucus (the "Senate Plaintiffs"),

together with Damascus Township, Dyberry Township, and Wayne County (the

"Municipal Plaintiffs") herby appeal to the United States Court of Appeals for the

Third Circuit from the July 2, 2021 Order dismissing the Amended Complaint with

prejudice as to all Plaintiffs (Exhibit A), *see* ECF No. 63, and the preceding Order

and Opinion entered on June 11, 2021 (Exhibit B), dismissing the claims of Senate

Plaintiffs with prejudice and the claims of Municipal Plaintiffs without prejudice.

*See* ECF No. 61 (Memorandum Opinion); ECF No. 62 (Order of the Court).

Respectfully submitted,

Dated: July 12, 2021

*/s/ Matthew H. Haverstick*
Matthew H. Haverstick. (No. 85072)
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Phone: (215) 568-2000
Email: mhaverstick@kleinbard.com
          jvoss@kleinbard.com
          svance@kleinbard.com
          szimmer@kleinbard.com
*Counsel for the Senate Plaintiffs*

*/s/Jeffrey S. Treat*
Jeffrey S. Treat, Esq. (No. 37069)
926 Court Street
Honesdale, PA 18431
(570) 253-1209
Email: jstreat@atd.net
*Counsel for Municipal Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2021, I caused a true copy of the Notice of

Appeal to be served via the Court's ECF System.

*/s/ Matthew H. Haverstick*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SENATOR GENE YAW, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civ. No. 21-119** |
| | : | |
| **THE DELAWARE RIVER BASIN** | : | |
| **COMMISSION, ET AL,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

    **AND NOW**, this 2nd day of July, 2021, Plaintiffs Damascus and Dyberry Townships and Carbon and Wayne Counties having failed to file a Second Amended Complaint in accordance with my June 11 Order, it is hereby **ORDERED** that:

1. The claims of Plaintiffs Damascus and Dyberry Townships and Carbon and Wayne Counties are **DISMISSED with prejudice**;

2. The Amended Complaint (Doc. No. 29) is **DISMISSED with prejudice**;

3. The Clerk of Court shall **CLOSE** this case.

 

                                      **AND IT IS SO ORDERED.**

                                        */s/ Paul S. Diamond*

                                        _____

                                        Paul S. Diamond, J.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SENATOR GENE YAW, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civ. No. 21-119** |
| | : | |
| **THE DELAWARE RIVER BASIN** | : | |
| **COMMISSION, ET AL,** | : | |
| | : | |
| **Defendant.** | : | |

---

**ORDER**

   **AND NOW**, this 11th day of June, 2021, upon consideration of Defendants' Motions to Dismiss (Doc. Nos. 34, 35, 39), Plaintiffs' Response (Doc. No. 54), Defendants' Replies (Doc. Nos. 57, 58, 59), Plaintiffs' Sur-Reply (Doc. No. 60), and all related submissions, it is hereby **ORDERED** that:

1. Defendants' Motions to Dismiss (Doc. Nos. 34, 35, 39) are **GRANTED** as follows;

2. The claims of Senators Yaw, Baker, and the Senate Republican Caucus are **DISMISSED with prejudice**;

3. The claims of Damascus and Dyberry Townships and Carbon and Wayne Counties are **DISMISSED without prejudice**.  These Plaintiffs may file a Second Amended Complaint **on or before July 1, 2021**.  If no Amended Complaint is filed, I will dismiss their claims with prejudice.

                        **AND IT IS SO ORDERED.**

                        */s/ Paul S. Diamond*
                        _____
                        Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SENATOR GENE YAW, et al., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. No. 21-119 |
| | : | |
| THE DELAWARE RIVER BASIN | : | |
| COMMISSION, et al, | : | |
| | : | |
| Defendant. | : | |

---

Diamond, J.                     <u>**MEMORANDUM**</u>                     June 11, 2021

     Two Pennsylvania state senators, their party caucus, and various municipalities ask me to declare that the Delaware River Basin Commission exceeded its authority by imposing a moratorium on fracking in the Delaware River Basin. Because Plaintiffs lack standing, I will grant Defendants' Motions to Dismiss.

## I.    JURISDICTION

     Plaintiffs bring this action pursuant to 28 U.S.C. § 2201. The Court has jurisdiction to hear the federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction to hear the state law claims under 28 U.S.C. § 1367. <u>See</u> <u>Cuyler v. Adams</u>, 449 U.S. 433, 438 (1981) ("the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question").

## II.    LEGAL STANDARDS

     In deciding a motion to dismiss, I must conduct a two-part analysis. <u>Fowler v. PMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009). First, I must accept Plaintiffs' factual allegations, and disregard legal conclusions or mere recitations of the elements. <u>Id</u>. I then determine whether the facts alleged make out a "plausible" claim for relief. <u>Id</u>. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has

acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Accordingly, Defendants must show that Plaintiffs have failed to allege facts sufficiently detailed to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

### III.    FACTUAL BACKGROUND

   A.  The Basin, the Compact, and the Commission

The DRB is the drainage basin of the Delaware River, which includes large swaths of land in Pennsylvania, Delaware, New Jersey, and New York.  See Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n, 894 F.3d 509, 515 (3d Cir. 2018).  In 1961, these states and the federal government entered into the Delaware River Basin Compact, an agreement "aimed at ensuring a unified approach to the conservation, utilization, development, management, and control of the water and related resources of the Basin." Id.  The Compact created the Delaware River Basin Commission and invested it with "a broad range of powers" to safeguard the waters in the DRB. Id.  The Commission comprises the Governors of each of the four member states— who may appoint alternates to represent them—and a federal representative appointed by the President.  (Compact § 2.2-2.3, Doc. No. 29-2, Ex. A.)

Under Compact § 3.8 (Referral and Review), the Commission is empowered to review "projects" undertaken in the DRB if they will have "a substantial effect on the water resources" of the DRB.  (Id. at § 3.8.)  The Commission may promulgate rules "for the procedure of submission, review and consideration of [such] projects[.]"  (Id.)  Under § 14.2 (Regulations; Enforcement), the Commission may "[m]ake and enforce reasonable rules and regulations for the effectuation, application and enforcement of th[e] Compact."  (Id. at § 14.2.)

The Compact may be modified or repealed by concurrent legislation of each of the Member

States or by Congress.  (Amend Compl. ⁋89; Compact at § 1.4.)

B.  Fracking in Pennsylvania

'High-volume hydraulic fracturing' or 'fracking' is "the process by which a mixture of water and various chemicals is injected into the ground at high pressure to cause the release of natural gas trapped in shale rock formations."  Wayne, 894 F.3d at 515 n. 1.  Fracking is a major business in Pennsylvania.  (Amend. Compl. ⁋⁋57-58 ("Since 2012, [fracking fees have] generated approximately $1.7 billion for [Pennsylvania] State and municipal governments."); id. at ⁋⁋49-50 (United States Geological Survey estimates $40 billion in natural gas reserves are contained in Pennsylvania Basin territory alone.)  To manage the practice, the Commonwealth has created a complex regulatory regime: "(1) overseeing the installation and operation of [] gas wells . . . and (2) providing for payment of various fees for their construction and/or operation."  (Amend. Compl. ⁋51.)  The Commonwealth may also execute leases for natural gas extraction on state-owned lands.  (Id. at ⁋68.)  The gas wells where fracking is performed are referred to as "Unconventional Wells."  (Id.)

Under the Pennsylvania regime, "all fees for the development of Unconventional Wells are deposited in the Unconventional Gas Well Fund (the 'Well Fund')."  (Id. at ⁋52.)  The Pennsylvania Treasury Department administers the Fund.  The proceeds are distributed annually in accordance with statutory requirements, under which "more than half of the Well Fund's annual revenue is distributed to the various municipalities where Unconventional Wells are located . . . ."  (Id. at ⁋54-55.)  The General Assembly "has substantial discretion in determining the specific allocation" of money in the Well Fund (as well as in other, natural gas-related funds).  (Id. at ⁋77.)

C.  The Moratorium

In 2009, the Commission's then-Executive Director, Carol Collier, instituted a Moratorium

banning most natural gas fracking projects "within the drainage area of Special Protection Waters" (which includes land in Pennsylvania), unless there was prior Commission approval.  Wayne, 894 F.3d at 517 (explaining the Commission's concern with fracking's "adverse environmental effects" on the DRB's water resources).  Expanded by a notice letter in 2010, this 'de facto' ban remained in place until February 25, 2021, when it was superseded by the Commission's vote to adopt a regulation "memorializing the ban set forth in the moratorium."  Id.; (Amend. Compl. ¶¶78-93); see also 18 C.F.R. §§ 440.1, et seq.  Based on various Compact provisions, the regulation is intended to "protect and conserve the water resources of the Delaware River Basin."  18 C.F.R. §§ 440.1(a)/(b).  The regulation reflects the Commission's belief that "high volume hydraulic fracturing poses significant, immediate and long-term risks to the development, conservation, utilization, management, and preservation of the water resources of the Delaware River Basin and to Special Protection Waters of the Basin." The regulation thus provides that "[h]igh volume hydraulic fracturing in hydrocarbon bearing rock formations is prohibited within the Delaware River Basin."  See id. at § 440.3(a)/(b).

D. Senate and Municipal Plaintiffs

Plaintiffs are two members of the Pennsylvania Senate (Gene Yaw and Lisa Baker), their party caucus (the Pennsylvania Senate Republican Caucus), and two Pennsylvania townships and two counties located within the DRB (Damascus Township, Dyberry Township, Wayne County, and Carbon County).  (Complaint, Doc. No. 1.)  Senator Yaw is the Chairman of the Senate Environmental Resources and Energy Committee; in this role he receives a detailed annual report regarding the Well Fund.  (Amend. Compl. ¶53 (citing 58 Pa.C.S. § 2314(h)).)  Senator Baker's legislative district "includes several state parks and forests located within the Basin."  (Id. at ¶73.)

The Republican Caucus "is a subsidiary body of the Senate created pursuant to the

chamber's constitutional authority and is tasked with performing essential legislative functions, as well as administrative business on behalf of the Senate." (Id. at ¶10.)  As of this writing, a majority of Pennsylvania Senators are members of the Republican Caucus.  (Id. at ¶11.)

Damascus and Dyberry Townships are political subdivisions of Pennsylvania located in Wayne County, which itself is a Plaintiff.  Carbon County is also a Plaintiff.  (Id. at ¶12-13.)

Plaintiffs allege that in 2019, municipalities in Susquehanna County (which is outside the DRB) received $5.7 million in Well Fund disbursements.  (Id. at ¶59.)  Plaintiffs further allege that "Municipal Plaintiffs' low population density and terrain renders them particularly well-suited for natural gas exploration and extraction."  (Id. at ¶60.)  Finally, Plaintiffs allege that some time before the 2009 Moratorium, "a group of landowners in Wayne County expended approximately $750,000 in legal fees to negotiate" a fracking lease, but the contract was "terminated" after the ban became effective, along with those of "countless" other landowners within the Basin.  (Id. at ¶66.)

E.  Defendants

Although Plaintiffs bring claims against only the Delaware River Basin Commission, several Parties have intervened as Defendants, including: the Delaware Riverkeeper Network and its Executive Director, Maya K. van Rossum; a collection of Pennsylvania Democratic Senators; and Bucks and Montgomery Counties.  (Doc. Nos. 15, 24, 47.)

IV.  PROCEDURAL HISTORY

From 2016 to 2020, some of the Parties that are Plaintiffs here tried unsuccessfully to intervene in a Middle District dispute in which a private company challenged the Moratorium.  See Wayne Land and Mineral Group, LLC v. Delaware River Basin Commission, No. 16 Civ. 897 (M.D. Pa. July 2, 2020); see also Wayne Land & Min. Grp., LLC v. Delaware River Basin

Comm'n, 959 F.3d 569, 577 (3d Cir. 2020) (remanding to the district court to consider whether the Senators had standing).  Following those unsuccessful intervention attempts, on January 11, 2021, Plaintiffs filed their initial Complaint in this Court.  (Doc. No. 1.)  A four-count Amended Complaint followed on March 31, 2021.  (Amend. Compl. at ¶81.)  Plaintiffs allege that the Moratorium: exceeds the Commission's authority under the Compact; is an unconstitutional taking of private and public property; is an illegal usurpation of the Commonwealth's power of eminent domain; and violates the constitutional guarantee of a republican form of government. Plaintiffs seek a declaratory judgment and injunctive relief against the Commission based on that judgment.

Defendants have filed three separate Motions to Dismiss the Amended Complaint.  In each, Defendants argue that Plaintiffs lack standing and, alternatively, have failed to state viable claims. (Dems. MTD, DRN MTD, DRBC MTD, Doc. Nos. 34, 35, 39.)  The matter has been fully briefed. (Resp., DRBC Reply, DRN Reply, Dems. Reply, Sur-Reply, Doc. Nos. 54, 57, 58, 59, 60.)

## V.     STANDING REQUIREMENTS

The Parties hotly debate fracking's benefits and harms.  (See, e.g., Dems MTD at 2; DRN MTD at 18-20; DRBC MTD at 14-16.)  For present purposes, these contentions are quite beside the point and underscore that this dispute is essentially political and so best resolved by the political branches of government.  See United States v. Richardson, 418 U.S. 166, 179 (1974).  The Court may address only questions of law—like standing—not questions of policy.  Because Plaintiffs have failed to show they have standing to prosecute this case, I must dismiss their claims.

### A.  Article III Standing

The Court may not hear this case if it lacks jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."); Fed. R. Civ. P. 12(b)(1). If

Plaintiffs are without standing, the Court is without jurisdiction to hear this matter.  Warth v. Seldin, 422 U.S. 490, 498–99 (1975) ("The Art[icle] III judicial power exists only to redress or otherwise to protect against injury to the complaining party.").

To establish Article III standing, Plaintiffs must show that:

(1) they suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision.

Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000); Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  Plaintiffs "must 'clearly . . . allege facts demonstrating' each element."  Id. at 1547 (citing Warth, 422 U.S. at 517).   Because "a valid claim for relief is *not* a prerequisite for standing," my "standing inquiry must avoid any consideration of the merits beyond a screening for mere frivolity."  Cottrell v. Alcon Labs., 874 F.3d 154, 166 (3d Cir. 2017) (emphasis in original); Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 479 (3d Cir. 2018).

I will first consider the question of standing for the Senate Plaintiffs: Senators Yaw, Baker, and the Republican Caucus.

B.  Legislative Standing

"The Supreme Court, with the lower courts following its lead, has developed a specialized set of standing rules to govern cases in which a legislator or legislative chamber seeks to assert or defend claims involving governmental action."  Matthew I. Hall, Making Sense of Legislative Standing, 90 S. Cal. L. Rev. 1, 9 (2016).  Although the familiar requirements of Article III apply to legislative plaintiffs, the standing analysis must be "especially rigorous," bearing in mind the separation of powers.  See Raines v. Byrd, 521 U.S. 811, 819-20 (1997) (separation of powers "inform[s]" legislative standing analysis).   Interstate compact suits implicate "federalism and

7

separation-of-powers concerns" because such agreements are made "among sovereign States" and "the political branches" consent to them.  Alabama v. North Carolina, 560 U.S. 330, 352 (2010); see Russell v. DeJongh, 491 F.3d 130, 133-34 (3d Cir. 2007) (suit brought by territorial legislator against territorial governor raised separation of powers issues); Alaska Legislative Council v. Babbitt, 181 F.3d 1333, 1337 (D.C. Cir. 1999) (suits brought by state legislators raise separation of powers issues).

Federal Courts have uniformly held that legislator-plaintiffs proceeding on their own behalf are without standing to allege an institutional injury.  See Virginia House of Delegates v. Bethune-Hill, 139 S. Ct. 1945, 1953-54 (2019) (citing Raines, 521 U.S. at 829) ("individual members lack standing to assert the institutional interests of a legislature"); State by & through Tennessee Gen. Assembly v. United States Dep't of State, 931 F.3d 499, 513-14 (6th Cir. 2019) (citing Raines, 521 U.S. at 821) ("individual legislator plaintiffs cannot bring suit for an alleged institutional injury"); Kerr v. Hickenlooper, 824 F.3d 1207, 1214 (10th Cir. 2016) (citing Raines, 521 U.S. at 821; Arizona State Legislature v. Arizona Independent Redistricting Commission, 135 S. Ct. 2562, 2664 (2015)) ("individual legislators may not support standing by alleging only an institutional injury"); see also Alaska Legislative Council, 181 F.3d at 1338 (alleging an "abstract dilution of institutional legislative power" will not support standing for individual legislators); Corman v. Torres, 287 F. Supp. 3d 558, 567 (M.D. Pa. 2018) (three-judge panel) ("a legislator suffers no Article III injury when alleged harm is borne equally by all members of the legislature").

This same standing limitation applies to legislative constituencies, such as party caucuses. Cf. Bethune-Hill, 139 S. Ct. at 1953-54 (sub-division of legislature cannot assert "interests belonging to the legislature as a whole").

Institutional injuries are those harms which "constitute[] some injury to the power of the

legislature as a whole rather than harm to an individual legislator." Kerr, 824 F.3d at 1214.  Such injuries thus fail to "zero[] in on any individual" legislator because they are "[w]idely dispersed," and "necessarily impact all [m]embers of [the legislature] equally." See id. at 1214 (citing Arizona, 135 S. Ct. at 2664).  The Supreme Court has reasoned that an individual legislator claiming an institutional injury lacks that "personal stake" in the outcome of the suit that Article III requires. See Arizona, 135 S. Ct. at 2664 (citing Raines, 576 U.S. at 830); see also Kerr, 824 F.3d at 1214.

These legislative standing limitations necessarily encumber efforts to involve the Courts in partisan political disputes.  See 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 3531.11.2 (3d ed.) (describing the Court's standing analysis in Raines as "standing informed—and indeed virtually controlled—by political question concerns"), cited with approval in Russell, 491 F.3d at 133-34.

## VI.   DISCUSSION

Although all Plaintiffs argue vigorously that they have standing, they do not.

### A.  Senate Plaintiffs Allege Institutional Injuries

The Amended Complaint is replete with allegations that the Commission and Pennsylvania government have harmed the Commonwealth and its citizens.  (Amend Compl. at ¶67 (Through the Moratorium, "the Commission is . . . interfering with the reasonable investment-backed expectations of [] landowners . . . ."); id. at ¶87 ("[T]he Commission's interpretation of . . . the Compact . . . potentially subsumes every undertaking within the Basin."); id. at ¶96 ("[The Moratorium's] deleterious effects have come into renewed focus in light of Governor Wolf's prolonged shutdown of the economy in response to COVID-19."); id. at ¶114 (The Moratorium has "exponentially diminished the value of property situated within the [Basin].").)  Because Plaintiffs do not even purport to stand in the shoes of the Commonwealth or all its citizens, these

very general allegations confer standing on no one.  See, e.g., Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 482–83 (1982) ("This Court repeatedly has rejected claims of standing predicated on 'the right, possessed by every citizen, to require that the Government be administered according to law . . .'") (internal citations omitted).

Insofar as Senate Plaintiffs make more focused allegations, they press quintessentially 'institutional' injuries.  They allege that the Moratorium: usurps "legislative authority" from the General Assembly, impugning its "fundamental power of enacting laws of statewide application"; has "palpably and substantially diminished the [Plaintiffs'] legislative powers"; and has worked "injury to the General Assembly's exclusive powers of suspending laws . . . and eminent domain." (Amend. Compl. ¶¶85, 122; Resp. at 8, 14); compare Collins v. Daniels, 916 F.3d 1302, 1313–14 (10th Cir. 2019) ("usurpation of [legislative] power" is an "institutional injury").

Unfortunately for Plaintiffs, the 'powers' the Moratorium ostensibly impairs are all vested in either the General Assembly or in the Commonwealth, not in individual legislators or their party caucuses.  See, e.g., Wolf v. Scarnati, 233 A.3d 679, 701, 706 (2020) (Commonwealth's Constitution "vests legislative power in the General Assembly," including "the power to suspend laws"); Reading Area Water Auth. v. Schuylkill River Greenway Ass'n, 100 A.3d 572, 578 (2014) (power of eminent domain is "vested in the Commonwealth"); Robinson, 83 A.3d at 926 ("General Assembly is vested with exclusive authority to regulate the oil and gas industry.").  Just as harm to Pennsylvania's authority is an injury *to the Commonwealth*—not to its legislative arm—so, too, harm to the Legislature's authority is an injury *to the Legislature*—not to its individual members. Cf. Babbitt, 181 F.3d at 1338 (if a power belongs to the state, then diminution of that power does injury to the state, not to its legislature).  Accordingly, Plaintiffs' claimed institutional injuries do

not afford them standing.

    In challenging this analysis, Plaintiffs invoke inapposite authority.  For example, they rely on <u>Coleman v. Miller</u>, where the Kansas Senate had been equally divided on the question of ratifying an amendment to the Federal Constitution.  307 U.S. 433, 435-36 (1939).  The Senate Secretary nonetheless deemed the amendment ratified because the state's Lieutenant Governor broke the tie by voting in favor of ratification.  <u>Id</u>.  The twenty opposing state senators challenged the constitutionality of that determination.  <u>Id</u>.  The Supreme Court ruled that the twenty senators had standing:

> [I]f they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.

<u>Id</u>. at 438.  The Supreme Court has since explained that

> <u>Coleman</u> stands (at most . . . ) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.

<u>Raines</u>, 521 U.S. at 823 (citing <u>Coleman</u>, 307 U.S. at 438); <u>but see</u> <u>Arizona</u>, 576 U.S. at 857 (Scalia, J., dissenting) ("<u>Coleman</u> was a peculiar case that may well stand for nothing.").  Nowhere in the Amended Complaint do Plaintiffs identify a "specific legislative Act" which would have passed (or been defeated) but for the Moratorium somehow 'nullifying' their votes.  <u>Compare</u> <u>Arizona</u>, 576 U.S. at 800-802 (in the absence of a 'specific legislative act,' the *entire* Arizona Legislature had standing to challenge result of state referendum which 'completely nullified' the Legislature's redistricting authority).

                                        ***

    Senate Plaintiffs offer two additional theories: that Pennsylvania law vests them with interests sufficient to confer standing; and that their role as 'trustees' under the Pennsylvania

Environmental Rights Amendment creates standing.  Although novel, the theories are meritless.

*State Law and Standing*

Plaintiffs note that "both federal law and state law . . . 'can create interests that support standing in federal courts.'"  Cottrell v. Alcon Labs., 874 F.3d 154 (3d Cir. 2017) (citing Cantrell v. City of Long Beach, 241 F.3d 674, 684 (9th Cir. 2001)).  Plaintiffs then urge that under state decisional law, "individual legislators have a protected interest in forestalling the usurpation of the state's lawmaking power."  (Resp. at 7-8 (citing Fumo v. City of Philadelphia, 972 A.2d 487, 502 (Pa. 2009), Allegheny Reprod. Health Ctr. v. Pennsylvania Dep't of Human Servs., 225 A.3d 902, 911 (Pa. Cmwlth. 2020).)  Plaintiffs thus conclude: "because the Pennsylvania State Constitution protects individual legislators' interest in exercising their legislative authority, the Senate Plaintiffs have sufficiently alleged an injury to a legally protected interest."  (Resp. at 12.)  This is little more than a legalistic sleight of hand.

Simply because state law has created an interest does not mean that state law will determine what *injuries* to that interest are sufficient to confer standing in Federal Court.  See, e.g., In re Remicade Antitrust Litigation, 345 F.Supp.3d 566, 585 (E.D. Pa. Dec. 7, 2018) (after identifying state law-created interest, court examined whether an Article III injury-in-fact had been pled).  As I have discussed, individual legislators cannot assert institutional injuries because such injuries are not particularized to them; this justiciability analysis is not altered by the *source* of the impaired interest.  Compare Babbitt, 181 F.3d at 1336-38 (any injury to state legislators' state law-created "authority to manage fish and wildlife" was not "particularized to them"); with Corman, 287 F.Supp.3d at 569 (any injury to state legislators' ostensible rights under the Federal Constitution's Elections Clause was not particularized to them).

Plaintiffs' cited authority does not suggest otherwise.  For instance, in Fumo, the

Pennsylvania Supreme Court explicitly distinguished "Article III standing" from state law questions when it ruled that state legislators had standing in Pennsylvania court to litigate alleged injuries to their "interest in maintaining the effectiveness of their legislative authority and their vote." 972 A.2d at 343 n. 5, 347. In any event, it is unsurprising that a Pennsylvania court would recognize a party's standing with little analysis of injury: Pennsylvania standing law is only "prudential"—not a strict constitutional requirement. See Monahan Off. Complex, LTD v. Borough of Dunmore, 2015 WL 5444903, at *3 (Pa. Commw. Ct. June 18, 2015) (internal citations omitted).

Plaintiffs nonetheless contend that state standing doctrine *alone* should determine standing in federal court. (See Sur-Reply at 4-5 (urging me to rely "on state law to discern the nature and extent of the alleged injury," and arguing that "where the alleged injury is to an interest guaranteed under state law, courts should consult state law"). This is simply incorrect. See, e.g., Hollingsworth v. Perry, 570 U.S. 693, 715 (2013) ("Standing in federal court is a question of federal law, not state law."); Protect Our Parks, Inc. v. Chicago Park Dist., 971 F.3d 722, 731 (7th Cir. 2020) (standing in federal court "does not turn on state law, which obviously cannot alter the scope of the federal judicial power."); see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 173 (2d Cir. 2005) (in diversity cases, "a plaintiff must have standing under *both* Article III of the Constitution *and* applicable state law in order to maintain a cause of action.") (emphasis added).

Finally, in Goode v. City of Philadelphia, the Third Circuit implicitly foreclosed Plaintiffs' state law argument. See 539 F.3d 311, 319 (3d Cir. 2008). There, Philadelphia City Council members, relying on Pennsylvania decisional law, sought to establish their standing as legislators to challenge the City's resolution of a dispute respecting billboard regulation. Id. at 316-319

13

(citing <u>Cohen v. Rendell</u>, 684 A.2d 1102 (Pa. Commw. Ct. 1996), <u>Morris v. Goode</u>, 107 Pa.Cmwlth. 529, 529 A.2d 50 (1987)).  Upholding the District Court's dismissal for lack of standing, the Circuit admonished that these decisions were not "helpful" because they involved state-created interests and "concerned standing in state court," and thus "could not address" the applicable federal standard.  <u>Id.</u> at 319; <u>Cohen</u>, 684 A.2d at 1105.

In sum, Plaintiffs' ask me to exchange Article III authority for friendlier state standards.  I decline to do so.

*ERA Trustee 'Standing'*

Plaintiffs also contend that: (1) under the Pennsylvania Constitution's Environmental Rights Amendment, they are 'trustees' of the Commonwealth's public natural resources; (2) as trustees, they have a fiduciary duty to "manage and oversee the trust" (which includes the natural resources as well as the money derived from their extraction); (3) the Moratorium "preclude[s] Plaintiffs from exercising those obligations relative to portions of the trust's corpus located within the Basin"; and (4) this 'interference' with Plaintiffs' fiduciary obligations is an injury-in-fact sufficient to confer standing.  (Resp. at 16-19; Sur-Reply at 7.)  Once again, Plaintiffs offer no apposite supporting authority.

The Environmental Rights Amendment provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27.  The Pennsylvania Supreme Court has held that "the right articulated in" the ERA is "neither meaningless nor merely aspirational."  <u>Robinson Twp., Washington Cty. v. Com.</u>, 83 A.3d 901, 951-52 (2013).  Rather,

The corollary of the people's Section 27 reservation of right to an environment of quality is an obligation on the government's behalf to refrain from unduly infringing upon or violating the right, including by legislative enactment or executive action. . . . [This] constitutional obligation binds all government, state or local, concurrently.

Id. The Court has also held that:

Trustee obligations are not vested exclusively in any single branch of Pennsylvania's government, and instead all agencies and entities of the Commonwealth government, both statewide and local, have a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality.

Pennsylvania Env't Def. Found. v. Commonwealth, 161 A.3d 911, 931-32, n. 23 (2017).

Senators Yaw and Baker are not ERA trustees because they are individual legislators, not Commonwealth agencies or entities. In none of the decisions Plaintiffs offer are public officials deemed to be ERA trustees. See Robinson Twp. v. Com., 52 A.3d 463, 473 (Pa. Commw. Ct. 2012), aff'd in part, rev'd in part sub nom. Robinson Twp., Washington Cty. v. Com., 623 Pa. 564, 83 A.3d 901 (2013).

Nor am I persuaded that Senator Yaw's statutory right to receive a report on the Well Fund confers ERA-trustee status on him. See 58 P.S. § 2314(h). Similarly, Senator Baker is not a trustee simply because her legislative district "overlap[s] with the Basin." (Resp. at 18-19.)

For these same reasons, the Senate Republican Caucus is not an ERA trustee: it is not a Commonwealth entity or agency for ERA purposes. The only supporting authority Plaintiffs offer addresses whether the Caucus is entitled to sovereign immunity, not whether it is a trustee bound by the ERA. See Precision Mktg., Inc. v. Com., Republican Caucus of the Sen. of PA/AKA Sen. of PA Republican Caucus, 78 A.3d 667, 675 (Pa. Cmwlth. 2013).

In these circumstances, Plaintiffs have not met their burden to demonstrate standing as ERA trustees. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

Even assuming arguendo that Plaintiffs have ERA trustee obligations, they would still lack

standing because they have not made out a cognizable injury.  See, e.g., Erickson v. AmeriCold Logistics, LLC, 311 F. Supp. 3d 1073, 1077 (D. Minn. 2018) ("The fact that plaintiffs are trustees does not excuse them from well established standing requirements.").  The injury Plaintiffs allege is insufficient: that the Moratorium has interfered with the exercise of their fiduciary duties in managing the trust, and that this in turn has injured the corpus of the trust.  (Amend. Compl. ¶93.) Once again, this is speculative at best.  Plaintiffs cannot derive standing from their exultant view of their own managerial talents.  I have found no authority suggesting that a trustee suffers an injury-in-fact whenever a government regulation limits her discretion in discharging a fiduciary duty, nor have Plaintiffs provided any.  Likewise, Plaintiffs offer no authority demonstrating that such fiduciary 'interference' necessarily injures the trust itself.

In these circumstances, Senate Plaintiffs have not shown that they are ERA trustees, or that they have been injured.  Senate Plaintiffs have thus failed to meet the "especially rigorous" legislative standing requirements.  Raines, 521 U.S. at 819-20.  Because allowing them to amend their pleading a second time would be futile, I will dismiss their claims with prejudice.

B.  Municipal Plaintiffs

The Township and County Plaintiffs ("the Municipalities") have obligations as trustees under the ERA.  See Robinson, 83 A.3d at 977 ("all existing branches and levels of government derive constitutional duties and obligations [from the ERA]").  As I have discussed, however, ERA-trustee status does not alone confer standing.  Moreover, the Municipalities have suffered no injury on which a standing claim could be based.

Plaintiffs apparently contend that because the townships and counties in which fracking occurs receive money from the Well Fund, then the Moratorium threatens such entities in the Basin with the "potential loss of funds" that would have accrued had fracking occurred there.  (Resp. at

19.)  This theoretical possibility does not confer standing.  The Municipalities have not pled that

fracking either would or "very likely would" occur within their borders but for the Moratorium.

Cf. MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy, 861 F.3d 40, 47-48 (2d Cir. 2017)

(citing Warth v. Seldin, 422 U.S. 490 (1975)) (injury was not actual or immanent where

municipality demonstrated no "concrete plans" or "serious attempts at negotiation" regarding

development opportunities); (Amend. Compl. ⁋⁋59-66).

Although the Moratorium has existed since 2009, the Municipalities allege a single missed

fracking opportunity.  As I have described, over twelve years ago (Plaintiffs offer no more detail),

a group of unnamed landowners in Wayne County conducted negotiations regarding a fracking

lease.  (Amend. Compl. at ⁋66.)  The lease contract became ineffectual when the Moratorium went

into effect.  Accepting these sketchy allegations as true, they obviously do not show that some

twelve years later, any of the Municipalities is suffering a current injury or has suffered a recent

injury.  See Lujan, 504 U.S. at 560 (injury-in-fact cannot be "conjectural"); In re Johnson &

Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig., 903 F.3d 278, 287 (3d Cir. 2018)

(same); (Amend. Compl. ⁋72 (alleging that the Municipalities own land containing natural gas

reserves but making no mention of the viability of or actual interest in extraction)).

The Spokeo Court's requirements of traceability and redressability are also absent here,

given the numerous factors that control the amount of natural gas that can be extracted from a

given place at a given time, as well as the General Assembly's "substantial discretion" in

determining how Well Fund money is allocated.  See Spokeo, 136 S. Ct. at 1547; ASARCO Inc.

v. Kadish, 490 U.S. 605, 615 (1989) (discretion defeats redressability); XY Plan. Network, LLC

v. United States Sec. & Exch. Comm'n, 963 F.3d 244, 253 (2d Cir. 2020) (no standing where

"countless variables" determine amount of state revenue generated); EPA, Hydraulic Fracturing

for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States, EPA/600/R-16/236ES (number of Unconventional Wells affected by gas and oil price fluctuations); (Amend. Compl. ¶77.)

In these circumstances, like the Senate Plaintiffs, the Municipalities have not met their burden of demonstrating standing. Unlike the Senate Plaintiffs, however, the Municipalities might be able to articulate how the Moratorium has actually injured them. Accordingly, I will allow the Municipalities to file a Second Amended Complaint.

## VII. CONCLUSION

Plaintiffs' inability to make out standing confirms that this dispute—which is primarily between two political parties—is primarily partisan and is best resolved through the political process. See, e.g., United States v. Richardson, 418 U.S. 166, 179 (1974).

Because I will dismiss for lack of standing, I need not address Defendants' cogent argument that the Amended Complaint fails to state a claim.

An appropriate Order follows.


**AND IT IS SO ORDERED.**

Dated: June 11, 2021                                  /s/ Paul S. Diamond

                                                     _____

                                                     Paul S. Diamond,